## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JODY LIU,**<br>          **Plaintiff**<br><br>**v.**<br><br>**CITY OF MEDFORD-MEDFORD**<br>**PUBLIC SCHOOLS, ROY BELSON, and**<br>**BEVERLY NELSON,**<br>          **Defendants** | **CIVIL ACTION NO.**<br><br><br>**PLAINTIFF'S COMPLAINT** |

## I.  NATURE OF CLAIM

Plaintiff, Jody Liu ("Liu"), brings this action alleging claims of:  race discrimination, gender discrimination, retaliation, equal pay, and failure to adequately investigate and remedy pursuant to M. G. L. c. 151B ("151B"), M.G.L. c. 149 § 105A ("MEPA"), 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), 29 U.S.C. § 1981 ("Section 1981"), and 29 U.S.C. § 206(d) ("EPA").

## II.    ADMINISTRATIVE PROCEEDINGS

1.      On or about April 12, 2018, Liu filed a timely Charge of Discrimination based on race, gender, and retaliation with the Massachusetts Commission Against Discrimination ("MCAD") and with the Equal Employment Opportunity Commission ("EEOC") against the Defendants.

2.      On or about February 18, 2021, and February 26, 2021, Liu received a Right to Sue Letter from the EEOC and a Notice of Dismissal after Withdrawal from the MCAD, respectively.

3.      Liu has satisfied all administrative prerequisites to filing this action.

### III.    JURISDICTION

4.    With respect to Liu's claims under Title VII, Section 1981, and the EPA, this Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

5.     With respect to Liu's claims under 151B and the MEPA, this court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

6.    Venue is proper pursuant to 28 U.S.C. § 1391 (b) as all Defendants reside in this judicial district.

### IV.    PARTIES

7.    Liu is an adult Asian female residing in Medford, Middlesex County, Massachusetts.

8.    The City of Medford-Medford Public Schools ("Medford"/"MPS"), is a public employer located in Middlesex County, Massachusetts.

9.    The City of Medford-Medford Public Schools is, and at all times relevant to this lawsuit was, an employer within the meaning of 151B, the MEPA, Title VII, Section 1981, and the EPA.

10.    Liu is, and at all times relevant to this lawsuit was, an employee of the City of Medford-Medford Public Schools within the meaning of 151B, the MEPA, Title VII, Section 1981, and the EPA.

11.    The City of Medford operates the Medford Public Schools by and through MPS Central Administration, which includes but is not limited to the Superintendent and Deputy Superintendent, and by and through the City of Medford School Committee.

12.     Roy Belson ("Belson") is an adult individual residing in Medford, Middlesex County, Massachusetts, and, at all times relevant to this lawsuit, was the Superintendent of MPS.

13.     At all times relevant to this Complaint, Belson exercised and/or attempted to exercise authority over Liu and initiated actions and/or had input into actions taken against Liu.

14.     Beverly Nelson ("Nelson") is an adult individual residing in North Andover, Essex County, Massachusetts, and, at all times relevant to this lawsuit, was the Deputy Superintendent of MPS.

15.     At all times relevant to this Complaint, Nelson exercised and/or attempted to exercise authority over Liu and initiated actions and/or had input into actions taken against Liu.

16.     As Superintendent and Deputy Superintendent, Nelson and Belson, were the leaders of MPS Central Administration.

17.     Medford acts by and through Nelson , Belson, and its School Committee in the oversight of its schools and school employees.

## V.     FACTS

18.     Ms. Liu grew up, and has spent nearly her entire life, in Medford.  She and her family members went through, and continue to go through, the Medford Public School system.

19.     After graduating from Medford High School, Ms. Liu obtained her Bachelor of Arts in English and Master of Arts in Teaching ("MAT") from Tufts University.

20.     Upon her graduation from Tufts with her MAT, Ms. Liu was hired by Medford-MPS as a Middle School Permanent Substitute Teacher for the 1988/1989 academic year.

21.     The very next year, Ms. Liu was appointed as an English/Language Arts and Social Studies Teacher for Grades 9 through 11 at the Medford Vocational Technical High

School where she worked for approximately three years.

22.     Ms. Liu obtained "Tenured" status and worked as an English/Language Arts Teacher for Grades 9-12 at Medford High School for the following approximately 24 years.

23.     Ms. Liu served as a Teacher at MPS for approximately 28 years.

24.     Ms. Liu has an inherent dedication and commitment to the Medford community at large, the Medford school system, and the students and families therein that is beyond reproach.

25.     Ms. Liu has dedicated her career to education and takes great pride in her work, her students, and Medford's commitment to the education of its children.  She fully supports the Medford Public School Mission of providing "a caring educational partnership of school, family and community designed to ensure that all students are afforded a safe and healthy environment in which they develop the knowledge, skills and attitudes to reach their full academic and personal potential" and its dedication "to providing all students with a 21st century education that will enable them to be life-long learners and contributors to a diverse and rapidly changing world."

26.     During her approximately 28 years as a Teacher for MPS, Ms. Liu also, *inter alia*: served in numerous Advisor roles, including heading the National Honor Society and the Asian Club; engaged in extensive class, school, and district-wide Curriculum Development; held the position of District Mentor Coordinator; developed, and participated in, the TAT/STAT programs; held leadership roles, and participated, in the Faculty Senate; was a member of the Steering Committee, Standards Chair, and an active contributor for three cycles of the New England Association of School and Colleges ("NEASC") Accreditations; engaged in an Assistant Principal Internship; held a leadership role, and participated, in the very profitable annual

4

Medford Jingle Bell run fundraiser; established very successful community, academic, and business partnerships that enhanced the educational experience and civic participation of all students; participated in the Medford High School Site Council; and created the fully functioning McGlynn Middle School ("McGlynn") Site Council.

27.     While focusing her career on the education of Medford's youth, Ms. Liu also continued in her own educational endeavors, engaging in Professional Development that included, but was not limited to, obtaining: her Mentor Teacher Certification from Harvard Graduate School of Education; a highly esteemed and competitive 3-Year National Endowment for the Humanities ("NEH") Fellowship at Harvard University's School of Russian Studies and Graduate School of Education; her Sheltered English Immersion ("SEI") Endorsement, a training certification which was also endorsed and conducted by the Department of Elementary and Secondary Education ("DESE"); her Certificate of Advanced Graduate Study ("CAGS") in School Administration; and her Educator's License as Principal/Assistant Principal for grades PreK through 6, 5 through 8, and 9 through 12.

28.     During her esteemed tenure as a Teacher, Ms. Liu received numerous accolades regarding her performance, as well as consistently positive evaluations.

29.     Liu's performance evaluations consistently rate her as "Exceeded" and "Exemplary," and praise her for, *inter alia*: exceeding goals regarding Progress Toward Student Learning and Progress Toward Professional Practice; "excelling in all areas of curriculum, planning, and assessment"; planning well ahead and gathering and using student feedback for planning purposes; engaging in meaningful communication with, and addressing the needs of, all students; enhancing student experience through streamlined communication outside the

classroom via various online resources; being committed to every child in her care and establishing good connections with her students and their families; enhancing the Medford school community; consistently taking on new extra-curricular activities; having "incredible follow-through in all of her undertakings;" establishing ongoing professional partnerships/collaborations with Harvard University, Tufts University, and various community organizations and businesses; having "impeccable" attendance and punctuality; engaging in open and ongoing communication with her colleagues; willingness to take on last-minute responsibilities and to lead the way and participate in school advancement; bringing the "highest level of quality and commitment to her work;" demonstrating a "mastery" of all eight of the district Focus Elements; and setting a "high standard of excellence" and improving with every year of service.  As one of Ms. Liu's supervisors put it: "if something important is happening in our school, chances are that Ms. Liu is part of it."

30.     Ms. Liu's colleagues, including Principals, Assistant Principals, and Directors of Curriculum and Instruction, also praise Ms. Liu for, *inter alia*: being a "team player" who is "highly respected" by students, colleagues, and administrators; "possessing qualities that are critical to successful leadership;" being "highly organized" and "purpose-driven;" being a "positive role model" for students and teachers; having "exceptional follow-through in all of her work;" being "proactive" and "collaborative;" communicating regularly with families to support student learning; organizing Professional Development opportunities for MPS teachers; being an "attentive and active member of the school community;" eagerly assuming leadership roles with the MPS District; leading the MPS National Honor Society to record highs in service hours, community projects, and fundraising; fostering strong community partnerships; demonstrating

6

"extreme attention to detail," "accuracy of record-keeping," "great enthusiasm," "passion," and "utmost competence" for what she does; exhibiting patience and a willingness to reassess and reposition one's perspectives and approaches; being driven and open to new challenges; being dedicated to supporting students and their education, putting additional hours in before school, after school and on the weekends; interacting professionally and retaining a calm demeanor even in difficult situations; communicating effectively with all stakeholders; and being an "asset" to MPS due to her dependability, diligence, enthusiasm, dedication, and commitment to students, their families and the District.

31.     Ms. Liu aspired to become an Assistant Principal and/or Principal in Medford Public Schools.

32.     Ms. Liu's aspiration to obtain such an Administrator position within MPS was a matter of general knowledge within MPS, and was evident through the responsibilities and Professional Development she voluntarily undertook throughout her teaching career, the latter of which included obtaining: Principal/Assistant Principal, Grades 5-8; Principal/Assistant Principal, Grades 9-12; and Principal/Assistant Principal, Grades PreK-6 Licensure in July 2013, June 2013, and February 2017, respectively.

33.     Ms. Liu also openly discussed her desire to obtain such an Administrator position with her colleagues and superiors, including but not limited to with then Superintendent Belson and then Deputy Superintendent Nelson.

34.     It is not uncommon for MPS to promote Teachers into Assistant Principal positions.  For example, N.T., D.B., R.T., D.R., D.D., N.S., M.G., S.G., and P.D. are all former Teachers who were appointed as Assistant Principals - all of whom are white, and two of whom

are female.  Nor was it uncommon for MPS to appoint individuals with despite little to no

Assistant Principal experience as Principals, i.e., P.K., J,Y.,C.D., and J.D.

35.     In fact, MPS Central Administration typically supports its Teachers in their efforts

to transition to an Administrator role and/or from one Administrator role to another, and exhibits

a preference for Administrators with ties to the Medford community.  Such support consists of,

*inter alia*: fairly considering, and often favoring, their applications for Administrator positions;

explicitly (including in writing) advising them of Central Administration's willingness to support

them "throughout" their transitions, and actually being accessible when approached; formally

introducing them to School staff and parents via announcement letters; issuing public

announcements of their appointments via the media and lauding their qualifications; and

providing the necessary resources (including but not limited to information and staffing) to

successfully perform their duties.

36.     Nonetheless, despite being a nearly lifelong resident of Medford and after decades

of exemplary and dedicated service to Medford Public Schools, its students, and the community

in general, Ms. Liu was repeatedly passed over for promotion to an Administrator role despite:

her years of Teaching experience; her qualifications; the consistent level of respect and praise she

had received from her peers and supervisors; and the vast amount of evidence and numerous

recommendations regarding her Administrator abilities and qualities.  More often than not, Ms.

Liu learned of her non-selection via the internal/external announcements regarding the selected

candidate.

37.     Ms. Liu's first application for an Administrator position was for Assistant

Principal at Medford High School for the 2013/2014 academic year - the very school at which

she had taught for the previous 20 years.

38.     Ms. Liu met the posted qualifications for the position, but was bypassed for the three open positions in favor of lesser qualified candidates.

39.     MPS hired two white males (N.T. and D.B.) and one white female (G.T.) for the three open positions.

40.     N.T. and D.B., like Ms. Liu, were both internal candidates with no prior Administrator role.  However, Ms. Liu had significantly more years of teaching experience; a higher level of education/certification; and significantly more experience in leadership roles.

41.     G.T. was an external candidate, with no ties to the Medford community, who had less than one-third of the teaching experience possessed by Ms. Liu.  Ms. Liu, here again, also had a higher level of education/certification and significantly more years of experience in leadership roles.  While G.T. had been an Assistant Principal in another school district, she had only held the position for one year.  Moreover, having previously served in an Administrator Role was not a position requirement.

42.     Shortly after Ms. Liu's non-selection for the position, Tucci (at the behest of Central Administration) approached Ms. Liu advising her that he could put a word in for her in another district and provide her with some leads.

43.     In or about 2015, Ms. Liu applied for an Assistant Principal position at Andrews Middle School for the 2016/2017 academic year.  Ms. Liu met the posted qualifications for the position, but was bypassed in favor of an, at best, equally qualified white male (D.D.).

44.     While Ms. Liu and D.D. have nearly equal years of teaching experience within MPS, Ms. Liu had a higher level of education/certification and significantly more years of

experience in leadership roles.  At the time of his selection over Ms. Liu, D.D. did not yet have

his Licensure as a Principal/Assistant Principal for Grades 5-8 which was a posted requirement

for the position.  Ms. Liu, on the other hand, had had her Licensure since 2013.  Moreover, the

Principal at Andrews Middle School who was involved in the interview and selection process

advised Ms. Liu that she had been his choice, but that the final decision was made by

Superintendent Belson.

45.    In or about 2015, Ms. Liu applied for an Assistant Principal position at the

McGlynn Middle School and was bypassed in favor of a black male (I.C.).  Belson belatedly told

Ms. Liu that I.C. was a "better fit," but did not elaborate as to why.

46.    Ms. Liu applied for an Assistant Principal position at the Roberts Elementary

School for the 2016-2017 academic year and was bypassed in favor of an, at best, equally

qualified white male.

47.    In or around July of 2017, MPS created an Assistant Principal position at Medford

High School.

48.    Ms. Liu advised both Belson and Nelson of her interest in the position, but was

told by both that she would not even be considered for the position at the High School where she

had been teaching for nearly two and one-half decades.

49.    Belson and Nelson told Liu that the position was being created for I.C. who had

not been successful in his role at the McGlynn Middle School which was in turmoil, but that she

could apply for the soon to be vacant Assistant Principal position at McGlynn.  The two further

stated words to the effect that they could not fire I.C. due to his race and the fact that he had not

been given his scheduled performance evaluation(s).

50.     Liu reluctantly applied for the McGlynn position, which was not a highly sought after position given the then tumultuous state of the school.  Although MPS did not post the High School position, Ms. Liu also made it clear that she was also applying for the "open" position at the High School.

51.     MPS' failure to post all "open" positions makes it entirely too easy to bypass qualified applicants and mask bias in the selection process.

52.     Ms. Liu was bypassed for the Assistant Principal position at the High School in favor of I.C. (a black, male) - a decision which Belson subsequently admitted was based, at least in part, on race.  In response to an MCAD inquiry as to why MPS considered I.C. but not Ms. Liu for the position, Belson stated that he considered I.C. a "better fit" because he was an "individual of color" and the student body was "diverse."

53.     Medford High School Principal John Perella would typically also be involved in the hiring decisions for Assistant Principal positions at his school and only one month earlier had approached Ms. Liu and asked her words to the effect of "what do you think of the quiet Asian stereotype?"

54.     Though denied the High School position for which she was unarguably a good fit, Ms. Liu was ultimately hired as Assistant Principal at the McGlynn Middle School for the 2017/2018 academic year.

55.     After numerous unsuccessful applications for an Administrator position despite her admitted qualifications, Ms. Liu was concerned that she was being set up to fail given that Belson and Nelson were only willing to appoint her to a position in which she had not expressed a direct interest at a school that was admittedly in significant turmoil.

56.     Though finally appointed as an Assistant Principal, Ms. Liu was, however, not provided with the required annual Stipend for having obtained her CAGS.  Not only were her white and/or male colleagues provided with the required Stipends, but at least one was actually relieved of the requirement that his salary be reduced due to a failure to fulfill certain academic requirements.  For example: L.I., I.C., and D.B.

57.     Unlike with other appointments, there was no public announcement regarding Ms. Liu's appointment as Assistant Principal despite her impressive qualifications; decades of exemplary performance; and her significant ties to the Medford community in which she had spent nearly her entire life and obtained her Elementary and Secondary education.

58.     Upon her appointment at McGlynn, Ms. Liu's supervisors were then Principal Jake Edwards ("Edwards"), then Deputy Superintendent Beverly Nelson, then Superintendent Roy Belson - individuals who have been the subject of allegations of gender-based harassment, gender-based assignments, and/or retaliation due to an internal complaint of disparate treatment of Special Education and English as a Second Language ("EL") students.  In fact, in or about early November, Edwards tried to make Ms. Liu write a bad evaluation about one of the female teachers who had filed said allegations with the MCAD just two months earlier.  Ms. Liu, in turn, reported Edwards' behavior to the Curriculum Director.

59.     In or about late 2017/early 2018, after having first raised the issue directly with Edwards, Ms. Liu complained internally (during two separate meetings) with Edwards, Nelson, and the Curriculum Director regarding disparate discipline of students based on race.  Ms. Liu specifically reported Edwards' failure to suspend violent white students, while suspending a student of color for conduct equal to/lesser than that engaged in by the white students.  For

example, J.P. and A.M. are white students who had committed serial offenses, including those involving violence, yet Edwards refused to impose suspensions and/or social probation.  In addition, J.P. and A.M. were part of a core group of white students who were continually verbally and physically bullying other students without disciplinary consequences.  Ms. Liu even forwarded an email to Edwards and Nelson regarding at least two of these white students, contemporaneously with her meetings with them on point.  She, of course, did not explicitly state in her email that the issue involved a matter of race as she had been advised by Nelson not to put sensitive issues about the School in writing.

60.     On the other hand, in this same time period, the one and only suspension meted out by Edwards was against G.C. - a black student, who had committed fewer/less serious offenses.

61.     While Ms. Liu may have been among one of the first to attempt to bring this very serious issue of racial disparity in the implementation of student discipline to the District's attention, it is an issue that has received much attention since her internal report and which was a topic of serious discussion and debate by the School Committee through at least 2020.  In fact, work undertaken by the School Committee's Equity Policy and Rules Sub-Committee revealed that "Black, Latinx, and disabled students are disproportionately suspended," with non-white students making up 62% of the students who are suspended and economically disadvanted students/students with disabilities representing 75% of those suspended.

62.     Following her internal complaint regarding disparate discipline based on race, Ms. Liu was subjected to adverse terms and conditions of employment.  She was routinely excluded from meetings and information that interfered with her ability to do her job, and not notified

when meetings were rescheduled.  She was often belatedly and/or never advised of task

expectations that were generated by Nelson, Belson, and/or the Curriculum Director, but never

relayed to her, and subsequently sternly berated for not completing said tasks.

In addition, an ever-increasing number of tasks were added to Ms. Liu's workload which became

so excessive that her typically longer than the norm work hours were still not enough time in

which to get the job done - requiring her to put in even longer days/evenings.

63.     The workload imposed upon Ms. Liu was greater than that imposed upon her

white/male colleagues, as well as that imposed upon her colleagues who had not complained of

discrimination.

64.     On or about February 15, 2018, Principal Edwards was placed on leave due to the

mishandling of an incident that involved the discovery of an ammunition clip in the School's

auditorium.  As such and given her position as Assistant Principal, Ms. Liu began to perform

Principal Edwards' duties (as well as her own) and was regularly working 12 to 14 hour days.

65.     As "acting principal," Ms. Liu was left to perform not only her usual and

customary Assistant Principal Duties, but also the usual and customary duties of a Principal

which included but were not limited to: assuming the role of the ultimate decision-maker in the

building, generally handling all daily decisions and actions; handling all student discipline

referrals; handling daily staff and staffing issues; sending out communications to families that

would have normally been sent by the Principal and were therefore, in some instances sent on the

Principal's letterhead; managing all parent complaints and/or meetings that rose to the level of

requiring Administrator involvement; managing the majority of postings to the School's website;

managing the scheduling of upcoming School events and revisions to the School calendar;

planning and implementing the infrastructure test of the School's technology in preparation for the School's first ever all computerized MCAS; review evacuation and safety plan needs and implement/oversee necessary updates; manage the monthly faculty meeting; oversee the arrival and exit of new/withdrawing students; deal with all truancy issues and re-entry plans; lead safety checks/respond to reported issues of weapons or danger; facilitate staff training; and maintain data and respond to requests for reports.

66.    As the Senior, and only, Administrator at the McGlynn, Ms. Liu was also tasked with planning the School's March, 2018, Open House - which is typically the role of the Principal.  While Central Administration emailed Ms. Liu thanking her for her work putting together the Open House, they refused to allow her to participate in the presentations despite the fact that she was then the sole Administrator assigned to the School and had prepared much of the materials.

67.    Ms. Liu wholly fulfilled the "Principal" role beyond the on-site arrival of N.T. (a white male) as Interim/Acting Principal on or about March 20, 2018, and frankly through at least 2019 she was continually assigned tasks that are customarily performed by Principals rather than Assistant Principals - including , but not limited to: the continued performance of some of the duties outlined in paragraph 65, above; total planning and oversight of the MCAS process; oversight of discipline for all grades; oversight of lunch and recess, at times with no other staff support and/or with less staff support than provided to other Assistant Principals; and conduct mandatory trainings during faculty meetings and MMS 101s with new teachers.

68.    Despite MPS policy of providing increased pay for an Administrator that performs work at a higher level for a period of four consecutive weeks, as well as state and federal law,

requiring equal pay for comparable work, MPS continued to pay Ms. Liu at the lower Assistant Principal rate of pay.  For example, while Ms. Liu's Assistant Principal Salary is approximately $106,000.00, Jake Edwards Principal salary was approximately $120,000.00 and N.T.'s Principal salary is approximately $133,000.00 - a difference of anywhere from $14,000.00 to $27,000.00.

69.     Given that Ms. Liu was performing the work of a Principal, involving comparable skill, effort, and responsibility, and performed under similar working conditions as that performed by her male colleagues, Ms. Liu repeatedly requested that she be accorded the higher rate of pay that was being provided to her male counterparts.

70.     Ms. Liu also requested (both verbally and in writing) that she be appointed Interim/Acting Principal of McGlynn, pointing out the strong relationships she had forged with McGlynn's parents and teachers and the work she had successfully completed in her relatively short time as Assistant Principal, including but not limited to: the significant progress she had made in improving student attendance - a factor that subsequently received effusive praise from the District Attendance Officer; correcting pre-existing safety flaws in the building; and updating the building safety plan.

71.     In this same writing, Ms. Liu also questioned why she is being "left in the dark and not included in any discussions or plans" for the School's future.

72.     Nelson responded to Ms. Liu's requests and inquiries by threatening her with the potential of receiving a negative performance evaluation and reminding her of the potentially negative consequences of same, stating words to the effect of "no one wants to see a bad evaluation" - clearly referring to those both within and outside the Medford School District at a time when Ms. Liu was past due for her first Administrator review.

16

73.     The Curriculum Director who was present at the time, also recognized the threatening nature of Nelson's statement as she subsequently approached Ms. Liu trying to belatedly explain that it actually was not meant to be a "threat."

74.     After little to no consideration, MPS denied both requests.  MPS simply refused to provide Ms. Liu equal pay for comparable work and appointed a white male as Interim/Acting Principal despite her qualifications for the role and the fact that she had been Assistant Principal at McGlynn for the previous seven months.

75.     A few weeks prior to N.T.'s arrival as Interim/Acting Principal, MPS brought another white male (R.S.) into McGlynn as "Vice Principal" under the auspices that he would be assisting Ms. Liu.  In reality, however, R.S. assumed only minor responsibilities such as bus and lunch duty, leaving Ms. Liu to perform the bulk of her Assistant Principal duties, as well as those of Principal.  Unlike Ms. Liu, R.S. was, however, included in Administrator meetings and privy to communications from Central Administration from which she was excluded.

76.     Ms. Liu repeatedly requested meetings with Nelson, N.T., and R.S. in order to clarify the division of duties; to clarify the parameters of the Assistant Principal and Principal responsibilities; and to report the disparate assignment of an excessive workload as compared to that assigned to her white male counterparts, including but not limited to R.S. and D.D.

77.     Ms. Liu's requests were first ignored and then summarily denied, with Nelson referring her to the Assistant Principal "job description" which simply states that "duties are delegated by the Principal acting in coordination with Central Administration."  Such a "job description," of course, makes it entirely too easy to require an Assistant Principal to perform the tasks of a Principal without the requirement of providing the higher rate of pay accorded

17

Principals.

78.     In or about March of 2018, Ms. Liu attempted to contact then Mayor Burke regarding hostile treatment she was being subjected to by D.G. and D.A. who had accosted her, yelling and stomping their feet, as they accused Ms. Liu of having reported the discovery of the ammunition clip and Edwards' involvement in it's subsequent disappearance.  D.G. and D.A. both had close relationships with Edwards who had been suspended and ultimately left his employment with MPS due to the ammunition clip incident.

79.     When Ms. Liu finally received a call back from the Mayor's Assistant weeks later, Ms. Liu was simply advised that she could speak to either D.A. (Assistant Principal at McGlynn Elementary School) or then Diversity Officer, Neil Osborne ("Osborne").  Given that her complaint involved D.A., Ms. Liu contacted Osborne, but did not hear back from him until in or about May.

80.     Ms. Liu finally realized that she was not going to be treated fairly despite her qualifications, positive work performance, and MPS' alleged commitment to the hiring and retention of minorities pursuant to its "written racial balance plan."

81.     Therefore, and no longer wanting to be stifled, despite her knowledge regarding MPS' negative reactions to those who dare complain, on or about April 12, 2018, Ms. Liu filed a Charge of Discrimination with the MCAD and EEOC, asserting claims for race discrimination, gender discrimination, and retaliation.

82.     The Defendants were aware of Ms. Liu's external complaint to the MCAD and EEOC.

83.     Shortly thereafter, although, the "open" position for Principal at McGlynn was not formally posted, Ms. Liu apprised both Nelson and Belson of her interest in applying for the role.

84.     Despite Ms. Liu's qualifications for the role and the fact that she had been Assistant Principal at McGlynn for nearly the entire academic year and had also been performing first basically all, and then a significant portion, of the Principal duties for approximately four of those months, Nelson and Belson refused to even consider Ms. Liu for the position.

85.     On or about May 10, 2018, Ms. Liu finally met with Osborne and raised concerns about the discriminatory, and now retaliatory, hostile work environment to which she was being subjected by, inter alia, her white/male colleagues D.G., D.A., R.M., and D.D.  Ms. Liu told Osborne that she was being ostracized, stared down, glared at with rancor, yelled at, and generally intimidated.  In response, Osborne proceeded to repeatedly ask Ms. Liu about the allegations in her MCAD Charge.  When she finally got him to focus on her post-Charge complaints of increased hostility, Osborne asked Ms. Liu if he could approach it informally and she agreed.

86.     Ms. Liu also brought her additional complaints of retaliation forward to the MCAD and EEOC via her post-Charge submissions, and to two of the then members of the School Committee.

87.     Thereafter, it was weeks before Ms. Liu heard from Osborne despite her repeated inquiries regarding what steps he had taken following their May 10th meeting and her requests for a copy of the notes he had taken during their meeting.  Unfortunately, his response was to deny her request for a copy of the notes of their meeting and to confirm that he had not in fact taken any steps in response to her complaints.

19

88.     On May 11, 2018, approximately one month following Ms. Liu's external complaint of discrimination and retaliation and one day after her meeting with Osborne, MPS appointed N.T. as Principal of McGlynn.

89.     N.T. is a white male who has not complained, either internally or externally, of discrimination and/or retaliation.

90.     Just two weeks, following the failure to even consider Ms. Liu for the role of Principal, never mind appoint her, and after just under one year in her role as Assistant Principal in a school that was admittedly in turmoil, Ms. Liu received a performance evaluation that lauded her for, *inter alia*: implementing and developing important study initiatives that "will continue to maximize learning for all students;" setting and modeling high expectations for the quality and content of student education and for supporting the school's teachers in reaching those expectations; identifying appropriate data sources to assist in student placements; planning, coordinating, and facilitating MCAS; developing new, effective, organized, and consistent means of communicating with students and their families (including EL families); developing strategic partnerships with community organizations, community members, and businesses that improve school effectiveness; and developing new systems that have improved the efficiency and practices of the school.

91.     At the time of N.T.'s selection over Ms. Liu, out of 44 MPS Administrator positions, there were only three non-whites: one Asian Assistant Principal (Ms. Liu); one African American Assistant Principal (I.C.); and one African American Principal (K.J.  In addition, the only female Principals within the MPS District were appointed at the Elementary School level.

92.     Despite Osborne's failure to take action in response to Ms. Liu's complaints, it quickly became abundantly clear that her colleagues were in fact advised of the fact that she had complained as D.G. actually apologized to Ms. Liu; others joined in on the hostile treatment; and still others simply continued and/or escalated their hostile behavior, which now included disparaging and false rumors that Ms. Liu was "crazy" and had been "demoted."

93.      The disparate treatment to which Ms. Liu was being subjected based on her gender and/or race, escalated and evolved in retaliation for her internal complaints of disparate discipline of students based upon race, her internal complaints about the discrimination and retaliation to which she was being subjected, and her filing of a Charge of Discrimination with the MCAD and EEOC.

94.     Following her internal and external complaints of discrimination and retaliation, Ms. Liu suffered from continued and additional adverse terms and conditions of employment as she was:  replaced at the Instructional Leadership meetings she had previously been attending; more frequently assigned to lunch and recess duties, required to monitor hundreds of students with limited (and at times) no other support staff; more frequently assigned to detention and evening events; assigned tasks that required her to spend her time isolated in her office, rather than being visible and accessible to McGlynn staff and students which is an integral part of an Assistant Principal's role; excluded from regular interaction with her Principal and Central Administration, despite her requests for same and the importance of such interaction to the role of an Assistant Principal; denied access to the School Committee; excluded from the Math Walks program; excluded from information regarding McGlynn, which made it difficult to do her job and made her appear inept to staff and parents who expected her to have answers to their

questions; kept out of the public eye by, *inter alia*, attempting to exclude her from speaking at the "Moving On" ceremony in the Spring of 2018 by falsely asserting that she is uncomfortable speaking in public - an event during which Ms. Liu was deliberately physically separated from her colleagues and the then Mayor; and denied her request to be moved out of her small, windowless office to a space across the way in the main office and instead moved to the third floor away from the main office altogether.

95.     Belson and Nelson both "voluntarily" retired in or about June of 2018.

96.     However, despite Belson's retirement and his status as a named Respondent in Ms.Liu's MCAD/EEOC Charge, he returned to MPS in September and basically ran the meeting during which his replacement as Superintendent was scheduled to review a grievance filed by Ms. Liu the previous May regarding the refusal to provide her with the pay due her for her performance as "Principal," as well as the stipend due her for her CAGS.

97.     Belson's inquires focused primarily on the allegations in Ms. Liu's MCAD/EEOC Charge rather than on the specifics of the grievance that was supposed to be at issue.

98.     Ms. Liu felt intimidated by both Belson's presence and the manner in which the meeting was conducted.  She reported her concerns to the Superintendent who responded by simply stating that the "meeting was to address the grievance concern only and not the MCAD claim" and that Belson was in attendance for "historical reference."

99.     Defendants discriminated against Liu because of her race and/or gender by, *inter alia*: failing to promote her to Administrator roles for which she was at least equally qualified as the non-Asian and/or male selected candidates; marginalizing of her role as Assistant Principal; isolating her from her colleagues, her students, and their families; excluding her from meetings

and/or information integral to the performance of her duties; assigning her an increased workload, including duties normally performed by those Administrators who are actual Principals; denying her contractually due pay differentials and/or stipends; making disparaging statements and allegations of misconduct regarding her; generally ostracizing her; and failing or refusing to adequately investigate and remedy discrimination in violation of state and federal law, as well as the Medford's/MPS's own policies.

100.     Defendants retaliated against Liu by, *inter alia*:  failing to promote her to Administrator roles for which she was at least equally qualified as the non-Asian and/or male selected candidates; marginalizing of her role as Assistant Principal; isolating her from her colleagues, her students, and their families; excluding her from meetings and/or information integral to the performance of her duties; assigning her an increased workload, including duties normally performed by those Administrators who are actual Principals; denying her contractually due pay differentials and/or stipends; making disparaging statements and allegations of misconduct regarding her; generally ostracizing her; and failing or refusing to adequately investigate and remedy discrimination in violation of state and federal law, as well as Medford's/MPS's own policies.

101.     Defendants violated MEPA and FEPA by:  paying Ms. Liu less than male coworkers who do work of comparable skill, effort, and responsibility; and/or failing to provide her with the stipend due her and provided to her male colleagues.

102.     Liu suffered loss of income and benefits, emotional distress, damage to her reputation, and attorney's fees as a result of the Defendants actions and failures to act.

## COUNT 1: RACE DISCRIMINATION IN EMPLOYMENT
### All Defendants

103.    Liu realleges and incorporates by reference the factual allegations contained in paragraphs 1 through 102 above.

104.    The actions and failures to act of the Defendants as set forth above constitute race discrimination and/or a hostile work environment in violation of M. G. L. c. 151B ("151B"),  42 U.S.C. § 2000(e), *et seq*. ("Title VII"), and 29 U.S.C. § 1981 ("Section 1981").

105.    As a result of those actions and failures to act, Liu has been damaged and continues to be damaged.

106.    The Defendants are liable to Liu for the full amount of her damages.

## COUNT 2: GENDER DISCRIMINATION IN EMPLOYMENT
### All Defendants

107.    Liu realleges and incorporates by reference the factual allegations contained in paragraphs 1 through 106 above.

108.    The actions and failures to act of the Defendants as set forth above constitute gender discrimination and/or a hostile work environment in violation of M. G. L. c. 151B ("151B") and 42 U.S.C. § 2000(e), *et seq*. ("Title VII").

109.    As a result of those actions and failures to act, Liu has been damaged and continues to be damaged.

110.    The Defendants are liable to Liu for the full amount of her damages.

## COUNT 3:  RETALIATION
### All Defendants

111.    Liu realleges and incorporates by reference the factual allegations contained in paragraphs 1 through 110 above.

112.    Liu engaged in protected activity by complaining internally of discrimination against both herself and MPS students, and by filing a Charge of Discrimination with the MCAD and EEOC.

113.    The Defendants knew of Liu's internal and external complaints.

114.    The actions and failures to act of the Defendants as set forth above constitute retaliation and/or a hostile work environment in violation of M. G. L. c. 151B ("151B"), 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), and 29 U.S.C. § 1981 ("Section 1981").

115.    As a result of those actions and failures to act, Liu has been damaged and continues to be damaged.

116.    The Defendants are liable to Liu for the full amount of her damages.

## COUNT 4: FAILURE TO INVESTIGATE AND REMEDY
### City of Medford - Medford Public Schools

117.    Liu realleges and incorporates by reference the factual allegations contained in paragraphs 1 through 116 above.

118.    Liu was subjected to discrimination and retaliation in violation of M. G. L. c. 151B ("151B"), 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), and 29 U.S.C. § 1981 ("Section 1981").

119.    Liu complained internally of discrimination and/or a hostile work environment against both MPS students and herself, and filed a Charge of Discrimination with the MCAD and

the EEOC.

120.    The City of Medford-MPS knew or should've known of the discrimination to which MPS students and Liu were being subjected, and knew of Liu's internal and external complaints.

121.    Pursuant to state and federal law, as well as Medford's-MPS's own policies, Medford-MPS had a legal duty and obligation to adequately, promptly, and fairly investigate and remedy Liu's complaints of discrimination.

122.    Respondent failed or refused to adequately, promptly, and fairly investigate and remedy Liu's complaints of discrimination.

123.    Respondent's actions and failures to act violated M. G. L. c. 151B ("151B"), 42 U.S.C. § 2000(e), *et seq*. ("Title VII"), and 29 U.S.C. § 1981 ("Section 1981").

124.    As a result, Liu, has been damaged and continues to be damaged.

125.    Medford-MPS is liable to Liu for the full amount of her damages.

### COUNT 5-VIOLATIONS OF MEPA AND EPA
### City of Medford - Medford Public Schools

126.    Liu realleges and incorporates by reference the factual allegations contained in paragraphs 1 through 125 above.

127.    Medford-MPS paid Liu less than her male coworkers who did work of comparable skill, effort, and responsibility.

128.    As a result, Liu has been damaged and continues to be damaged.

129.    Medford-MPS is liable to Liu for the full amount of her damages.

**WHEREFORE**, Plaintiff, Jody Liu, respectfully demands that this Court enter judgment in her favor and against the Defendants, for the full amount of her damages together with punitive and/or liquidated damages, interest, costs and reasonable attorney's fees, and grant such other and further relief as this Court deems just and appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

                                        PLAINTIFF,
                                        JODY LIU
                                        By her Attorney,


                                        /S/ Anne Glennon
                                        _____
                                        Anne Glennon, Esq. BBO# 658525
                                        Law Office of Anne Glennon
                                        340 Court Street, 2nd Floor
                                        Plymouth, Massachusetts 02360
                                        (774) 283-4760
                                        Anneglennon.esq@gmail.com

Dated: March 19, 2021